

PHELAN
HALLINAN
SCHMIEG

Representing Lenders in
Pennsylvania and New Jersey

Suite 1400
1617 JFK Boulevard
Philadelphia, PA 19103-1814
215-563-7000
Bankruptcy Fax: 215-568-7616
Joseph.schalk@fedphe.com

Joseph P. Schalk, Esquire
Bankruptcy Attorney

January 8, 2007

Carlo Sabatini, Esquire
142 North Washington Avenue
Suite 800
Scranton, PA 18503

      Via Fax (570) 504·2769
    In re:   Mary Alice Hannon
           Bankruptcy No. 5:06-51870

Dear Carlo:

      Please allow this letter to serve as Countrywide Home Loan's response to your letter dated December 12, 2006, wherein you advised that it was your intention to pursue Rule 9011 Sanctions unless Countrywide's Proof of Claim was amended to accurately reflect the pre-petition mortgage arrears.

      First, please be advised that an Amended Proof of Claim was filed on December 29, 2006. The Amended Proof of Claim includes pre-petition mortgage arrears in the amount of $6,794.53, a reduction of $2,500.00.

      With respect to the questions posed in your December 12, 2006 letter, please see the below responses:

1.      Please see the attached Foreclosure Invoices for the date all costs were incurred. Please see the attached Escrow History for the date all escrow items were paid.

2.      With respect to the Foreclosure fees and costs, Goldbeck, McCafferty, & McKeever was the payee. With respect to the Escrow items, the payee is clearly identified on the Escrow history.

3.      Invoices are only available for the Foreclosure fees and costs. Copies have been attached hereto for your review.

This firm is a debt collector attempting to collect a debt. Any information received will be used for that purpose. If you have received a discharge in bankruptcy, this is not and should not be construed as an attempt to collect a debt. We are only proceeding against the real estate secured by the mortgage.



Representing Lenders in
Pennsylvania and New Jersey

4.    With respect to the Foreclosure fees and costs, cancelled checks will not be
provided as Countrywide has provided the detailed invoices.  With respect to the
escrow items, copies of the cancelled checks for each item have been requested
and will be provided once available.

5.    There have been no amounts reimbursed by any of these third parties to date.
Specifically, no sheriff's refund has been issued to date.

6.    Due to the fact that there are no reimbursements, no such documentation can be
provided.

7.    Please direct your attention to Page 5, Section 3 of the mortgage, which provides
for recovery of escrow items.  Please direct your attention to Page 9, Section 10 of
the mortgage, which provides for mortgage insurance.  Please direct your
attention to Page 8, Section 9, as well as Page 14, Section 22, of the mortgage,
which provide for the recovery of attorney's fees and costs.  Please direct your
attention to Page 11, Section 14, which provides for the recovery of loan charges.
Please direct your attention to Page 12, Section 19, which provides for Borrower's
Right to Reinstate the Account after Acceleration.

8.    Title services were provided by Landsafe, which is an affiliate of Countrywide
Home Loans.

9.    No, there is no affiliation or common ownership between McCalla Raymer and
the entity that provided the title services.

Please review the attached documents provided in support of these responses and advise
whether any additional information will be needed.

Thank you for your professional courtesy in this matter.

Sincerely,

Joseph P. Schalk, Esquire

This firm is a debt collector attempting to collect a debt.  Any information received will be used for that purpose.  If you have
received a discharge in bankruptcy, this is not and should not be construed as an attempt to collect a debt.  We are only
proceeding against the real estate secured by the mortgage.

## Escrow Advance in the amount of $510.85

| Date Disbursed | Check# | Amount for this loan | Payee | Clear Date | Total Amt of Check |
|---|---|---|---|---|---|
| 9/7/06 | 7256156 | $438.20 | Ashley Borough Tax | 9/19/06 | $851.44 |
| 9/15/06 | 7341702 | $39.20 | PMI Mortgage Ins. Co. | 9/25/06 | $7,490,164.24 |
| 10/12/06 | 7591655 | $39.20 | PMI Mortgage Ins. Co. | 10/19/06 | $7,574,085.89 |

**PAYMENT HISTORY**
**Mary Alice Margaret Hannon**
**Loan #042475778**

| Payment Made On | Applied Contractually To | Amount | Principal Paid | Interest Paid | Late Charge | Applied to Suspense | Suspense Balance | Applied to Escrow | Escrow Balance | Principal Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| 9/7/2006 | (school taxes) | $0.00 | $0.00 | $0.00 | | | $0.00 | $0.00 | $5.75 | $47,817.63 |
| 9/15/2006 | (PMI) | $0.00 | $0.00 | $0.00 | | | $0.00 | ($438.20) | ($432.45) | $47,817.63 |
| 10/12/2006 | (PMI) | $0.00 | $0.00 | $0.00 | | | $0.00 | ($39.20) | ($471.65) | $47,817.63 |
| 11/13/2006 | (PMI) | $433.00 | $0.00 | $0.00 | | $433.00 | $433.00 | ($39.20) | ($510.85) | $47,817.63 |
| 11/15/2006 | (PMI) | $0.00 | $0.00 | $0.00 | | | $433.00 | $0.00 | ($510.85) | $0.00 |
| 12/11/2006 | (PMI) | $433.00 | $0.00 | $0.00 | | $433.00 | $866.00 | ($39.20) | ($550.05) | $0.00 |
| 12/11/2006 | (Haz. ins) | $0.00 | $0.00 | $0.00 | | | $866.00 | $0.00 | ($550.05) | $0.00 |
| 12/14/2006 | (PMI) | $0.00 | $0.00 | $0.00 | | | $866.00 | ($523.00) | ($1,073.05) | $0.00 |
| 12/22/2006 | Mar-06 | $0.00 | $50.70 | $259.01 | | ($443.15) | $422.85 | $133.44 | ($978.81) | $50.70 |

1

**GOLDBECK McCAFFERTY & McKEEVER**
Suite 5000, Mellon Independence Center
701 Market Street
Philadelphia, PA 19106-1532
www.goldbecklaw.com

**TO:** NEW INVOICE - COUNTRYWIDE Home Loans
Use 'New Invoice' program to submit bill.

**DATE:** 7/24/2006   ***INITIAL BILL - COSTS ONLY - NO COUNSEL FEES ARE INCLUDED***

**Invoice for Mortgage Representation**

Account #: 42475778   HANNON, MARY A.

Our Invoice #: 00013679

Our File #: CWD-6160

Our Tax ID #: 23-2179697

| Property Address |
|---|
| 14 Rutz Street |
| Ashley, PA 18706-2718 |

**In accordance with our billing agreement, these are costs incurred to date.**

29

Costs

| | | |
|---|---|---|
| 07/07/2006 | Prohtontoary | $106.00 |
| 07/06/2006 | sheriff service costs | $81.00 |
| 07/24/2006 | 6.18 | $2,500.00 |
| | **Total Costs for our Invoice #00013679** | **$2,687.00** |

**PLEASE REMIT PAYMENT TO:**   **GOLDBECK McCAFFERTY & McKEEVER**
Suite 5000, Mellon Independence Center
701 Market Street
Philadelphia, PA 19106-1532

Thank you for allowing us to be of service.
la

| CHRONOLOGY | |
|---|---|
| File Received | 07/06/06 |
| Complaint Filed | 07/10/06 |
| Service Completed | 07/12/06 |
| Judgment Prepared | 08/14/06 |
| Sale Scheduled for: | 12/01/06 |

Billing questions? Contact Marie at (215) 825-6335, FAX (215) 825-6435, EMAIL mcampuzano@goldbecklaw.com

### GOLDBECK McCAFFERTY & McKEEVER
### Suite 5000, Mellon Independence Center
### 701 Market Street
### Philadelphia, PA 19106-1532
### www.goldbecklaw.com

TO: NEW INVOICE - COUNTRYWIDE Home Loans
Use 'New Invoice' program to submit bill.

DATE: 11/2/2006

**Invoice for Mortgage Representation**

Account #: 42475778                          HANNON, MARY A.

Our Invoice #: 00019697

Our File #: CWD-6160

Our Tax ID #: 23-2179697

Invoice sent due to: 11 BK Filed              BK Filed: 10/24/2006        Chapter 13

| Property Address |
|---|
| 14 Rutz Street |
| Ashley, PA 18706-2718 |

**Costs**

| | | |
|---|---|---|
| 08/15/2006 | Prothonotary | $44.00 |
| 09/01/2006 | Sheriff-Sale Costs | $2,500.00 |
| | | **$2,544.00** |

**Fees**

| | | |
|---|---|---|
| 07/06/2006 | Standard Foreclosure Fee | $1,250.00 |
| 08/31/2006 | 3129 Certification | $125.00 |
| 11/02/2006 | Bankruptcy Search | $15.00 |
| | | **$1,390.00** |

| | |
|---|---|
| Total Costs and Fees for our Invoice #00019697 | **$3,934.00** |

**Invoice History:**

| | | |
|---|---|---|
| 07/23/2006 | ***** Payment Received ***** Thank you | ($2,687.00) |
| 07/23/2006 | Costs and Fees for our Invoice Number 00013679 | $187.00 |
| 10/29/2006 | Costs and Fees for our Invoice Number 00019697 | $3,934.00 |
| | Outstanding Balance of Costs and Fees | $1,434.00 |

PLEASE REMIT PAYMENT TO:          **GOLDBECK McCAFFERTY & McKEEVER**
**Suite 5000, Mellon Independence Center**
**701 Market Street**
**Philadelphia, PA 19106-1532**

Thank you for allowing us to be of service.
Seth G.

Billing questions?  Contact Marie at  (215) 825-6335, FAX (215) 825-6435, EMAIL mcampuzano@goldbecklaw.com



610   042475778   D2   001   001

Prepared By:

FIRST MAGNUS FINANCIAL CORPORATION
5285 E. WILLIAMS CIRCLE, #2000
TUCSON, AZ 85711

Return To:

FIRST MAGNUS FINANCIAL CORPORATION

5285 EAST WILLIAMS CIRCLE, #2000
TUCSON, AZ 85711

Parcel Number:
J9NE1N4L9

―――――――――[Space Above This Line For Recording Data]―――

# MORTGAGE

LOAN NO.: 2005001755

MIN   100039220050017554
MERS Phone: 1-888-679-6377

DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated     DECEMBER 23, 2003
together with all Riders to this document.
(B) "Borrower" is
MARY A. HANNON, A SINGLE WOMAN

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee
under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint MI 48501-2026, tel. (888) 679-MERS.

Initials: M θH

PENNSYLVANIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS     Form 3039  1/01
VMP-6A(PA) (0205)                          Page 1 of 16          LENDER SUPPORT SYSTEMS INC. MERS6APA.NEW (10/02)

REC Book 3004 Page 3200

(D) "Lender" is
FIRST MAGNUS FINANCIAL CORPORATION, AN ARIZONA CORPORATION

Lender is a CORPORATION
organized and existing under the laws of ARIZONA
Lender's address is
5285 EAST WILLIAMS CIRCLE, SUITE 2000, TUCSON, AZ 85711

(E) "Note" means the promissory note signed by Borrower and dated     DECEMBER 23, 2003
The Note states that Borrower owes Lender
FORTY NINE THOUSAND AND NO/100 X X X X X X X X X X X X X X X X X X X X X X

Dollars
(U.S. $ 49,000.00                ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than     JANUARY 01, 2034

(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider       ☐ Condominium Rider            ☐ 1-4 Family Rider
☐ Graduated Payment Rider     ☐ Planned Unit Development Rider ☐ Biweekly Payment Rider
☐ Balloon Rider               ☐ Rate Improvement Rider        ☐ Second Home Rider
☐ Other(s) [specify]

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

Initials: _mA kl_

VMP-6A(PA) (0205)                          Page 2 of 16                          Form 3039   1/01

REC Book 3004 Page 3201

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the                    COUNTY
[Type of Recording Jurisdiction] of            LUZERNE            [Name of Recording Jurisdiction]:

LEGAL DESCRIPTION ATTACHED HERETO AND MADE PART HEREOF ......AND BEING MORE PARTICULARLY DESCRIBED IN EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

CERTIFIED PROPERTY IDENTIFICATION NUMBER
MUNICIPALITY _Ashley Bro_
PIN MAP _09hE1_ BLOCK _4_ LOT _9_
TRANSFER_____ DIVISION_____
DATE _01-b-07_      Mapping Clerk

which currently has the address of

14 RUTZ STREET                                        [Street]
          ASHLEY        [City] , Pennsylvania        18706        [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

VMP-8A(PA) (0205)                    Page 3 of 18                    Initials: _MAH_
                                                                     Form 3039  1/01

REC Book 3004 Page 3202

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment

VMP-6A(PA) (0209)                    Page 4 of 16                    Initials: _MOH_
                                                                    Form 3039  1/01

REC Book 3004 Page 3203

can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest

VMP-6A(PA) (0205)                          Page 5 of 10

Initials: MAH
Form 3039  1/01

REC Book 3004 Page 3204

shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

VMP-6A(PA) (0200)                    Page 6 of 16                    Initials: _____ Form 3039   1/01

REC Book 3004 Page 3205

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

VMP-6A(PA) (0206)        Page 7 of 16        Initials MAH
Form 3039  1/01

REC Book 3004 Page 3206

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

VMP-6A(PA) (0206)                          Page 8 of 16                    Initials: ⁓⁓⁓⁓
                                                                          Form 3039  1/01

REC Book 3004 Page 3207

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

VMP-6A(PA) (0206)                          Page 0 of 16                     Initials: _MAH_
                                                                           Form 3039  1/01

REC Book 3004 Page 3208

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be

dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to

VMP-6A(PA) (0208)                          Page 11 of 16                          Initials: _MJH_
                                                                                  Form 3039   1/01

REC Book 3004 Page 3210

have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or

VMP-6A(PA) (0208) Page 12 of 16 Initials: M.A.H

Form 3039 1/01

REC Book 3004 Page 3211

agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

VMP-6A(PA) (0206)                    Page 13 of 16                    Initials: _MAH_
                                                                       Form 3039  1/01

LOCATION IN ......

ALL the surface or right of soil of that certain lot, piece, parcel or tract of land, situate, lying and being in the Borough of Ashley, County of Luzerne, and Commonwealth of Pennsylvania, bounded and described as follows, to wit:

BEGINNING at the northwesterly corner of land quitclaimed to Anthony Koonrad, et ux., by Glen Alden Corporation by deed dated May 16, 1960 situated on the easterly side of Rutz Lane in the Borough of Ashley, Luzerne County, Pennsylvania;

THENCE along the easterly line of Rutz Lane, North forty six degrees thirty five minutes West (N. 46" 35' W.) fifty (50) feet to a corner, being the southwesterly corner of land quitclaimed to Michael Wackovsky, et ux., by Glen Alden Corporation by deed dated October 3, 1960;

THENCE along the southerly line of aforesaid land and lands of others, North forty three degrees twenty five minutes East (N 43° - 25' E.) one hundred twelve (112) feet to a corner, being the northwesterly corner of land quitclaimed to John J. Yanchak, et ux., by Glen Alden Corporation by deed dated October 22, 1962;

THENCE along the westerly line of aforesaid land, South forty six degrees thirty five minutes East (S. 46° - 35' E.) fifty (50) feet to a corner on the northerly line of land of above mentioned Anthony Koonrad, et ux., said corner also being the southwesterly corner of land of John J. Yenchak, et ux.;

THENCE along the northerly line of land now or late of Anthony Koonrad, et ux., South forty three degrees twenty five minutes West (S. 43° - 25' W.) one hundred twelve (112) feet to the place of beginning.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). Lender shall notify Borrower of, among other things: (a) the default; (b) the action required to cure the default; (c) when the default must be cured; and (d) that failure to cure the default as specified may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. Lender shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured as specified, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence to the extent permitted by Applicable Law.

23. Release. Upon payment of all sums secured by this Security Instrument, this Security Instrument and the estate conveyed shall terminate and become void. After such occurrence, Lender shall discharge and satisfy this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waivers. Borrower, to the extent permitted by Applicable Law, waives and releases any error or defects in proceedings to enforce this Security Instrument, and hereby waives the benefit of any present or future laws providing for stay of execution, extension of time, exemption from attachment, levy and sale, and homestead exemption.

25. Reinstatement Period. Borrower's time to reinstate provided in Section 19 shall extend to one hour prior to the commencement of bidding at a sheriff's sale or other sale pursuant to this Security Instrument.

26. Purchase Money Mortgage. If any of the debt secured by this Security Instrument is lent to Borrower to acquire title to the Property, this Security Instrument shall be a purchase money mortgage.

27. Interest Rate After Judgment. Borrower agrees that the interest rate payable after a judgment is entered on the Note or in an action of mortgage foreclosure shall be the rate payable from time to time under the Note.

VMP-6A(PA) (0206)                    Page 14 of 16                    Initials: *m-9A*
Form 3039  1/01

REC Book 3004 Page 3213

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____
                                    -Witness

_____
                                    -Witness


_____      _____(Seal)     _____      _____(Seal)
MARY A. HANNON                       -Borrower                                                -Borrower

_____      _____(Seal)     _____      _____(Seal)
                                     -Borrower                                                -Borrower

_____      _____(Seal)     _____      _____(Seal)
                                     -Borrower                                                -Borrower

_____      _____(Seal)     _____      _____(Seal)
                                     -Borrower                                                -Borrower


VMP-6A(PA) (0205)                         Page 15 of 16                         Form 3039  1/01


REC Book 3004 Page 3215

Certificate of Residence

I, *Michael Bailey*                                                    , do hereby certify that
the correct address of the within-named Mortgagee is P.O. Box 2026, Flint, MI 48501-2026.

Witness my hand this                          day of        .

_____

**Agent of Mortgagee**


COMMONWEALTH OF PENNSYLVANIA,        *LACKAWANNA*              County ss:

On this, the    *23RD*    day of    *DECEMBER*    *2003*    , before me, the
undersigned officer, personally appeared
MARY A. HANNON

known to me (or
satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged that he/she/they executed the same for the purposes herein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.
My Commission Expires:

_____

┌─────────────────────────────────┐
│         Notarial Seal           │
│ Michael F. Bailey, Notary Public│
│ Moosic Boro, Lackawanna County  │
│ My Commission Expires Feb. 12, 2005 │
└─────────────────────────────────┘

**Title of Officer**


VMP-6A(PA) (0206)                          Page 16 of 16                          Initials *MAH*
                                                                                  Form 3039  1/01


**REC Book 3004 Page 3216**

LC  )E

Issu       610   042475778   D1   001   001        )ration        POLICY NUMBER



Lawyers Title Insurance Corporation is a member of the
LandAmerica family of title insurance underwriters.

G47-2237398.

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, LAWYERS TITLE INSURANCE CORPORATION, a Virginia corporation, herein called the Company, insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the insured by reason of:

1.  Title to the estate or interest described in Schedule A being vested other than as stated therein;
2.  Any defect in or lien or encumbrance on the title;
3.  Unmarketability of the title;
4.  Lack of a right of access to and from the land;
5.  The invalidity or unenforceability of the lien of the insured mortgage upon the title;
6.  The priority of any lien or encumbrance over the lien of the insured mortgage;
7.  Lack of priority of the lien of the insured mortgage over any statutory lien for services, labor or material:
    (a) arising from an improvement or work related to the land which is contracted for or commenced prior to Date of Policy; or (b) arising from an improvement or work related to the land which is contracted for or commenced subsequent to Date of Policy and which is financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance;
8.  The invalidity or unenforceability of any assignment of the insured mortgage, provided the assignment is shown in Schedule A, or the failure of the assignment shown in Schedule A to vest title to the insured mortgage in the named insured assignee free and clear of all liens.
    The Company will also pay the costs, attorneys' fees and expenses incurred in defense of the title or the lien of the insured mortgage, as insured, but only to the extent provided in the Conditions and Stipulations.

IN WITNESS WHEREOF, LAWYERS TITLE INSURANCE CORPORATION has caused its corporate name and seal to be hereunto affixed by its duly authorized officers, the Policy to become valid when countersigned by an authorized officer or agent of the Company.

LAWYERS TITLE INSURANCE CORPORATION

Attest: _J.h.D.Web_                By: _Janet A. Alpert_

                                   Secretary                                   President

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1.  (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy. (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2.  Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3.  Defects, liens, encumbrances, adverse claims or other matters:
    (a) created, suffered, assumed or agreed to by the insured claimant; (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy; (c) resulting in no loss or damage to the insured claimant; (d) attaching or created subsequent to Date of Policy (except to the extent that this policy insures the priority of the lien of the insured mortgage over any statutory lien for services, labor or material); or (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage.
4.  Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the land is situated.
5.  Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.
6.  Any statutory lien for services, labor or materials (or the claim of priority of any statutory lien for services, labor or materials over the lien of the insured mortgage) arising from an improvement or work related to the land which is contracted for and commenced subsequent to Date of Policy and is not financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance.
7.  Any claim, which arises out of the transaction creating the interest of the mortgagee insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:
    (a) the transaction creating the interest of the insured mortgagee being deemed a fraudulent conveyance or fraudulent transfer; or
    (b) the subordination of the interest of the insured mortgagee as a result of the application of the doctrine of equitable subordination; or
    (c) the transaction creating the interest of the insured mortgagee being deemed a preferential transfer except where the preferential transfer results from the failure:
        (i)  to timely record the instrument of transfer; or
        (ii) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

## LAWYERS TITLE INSURANCE CORPORATION
### NATIONAL HEADQUARTERS - RICHMOND, VIRGINIA

Issued with: A75-0885791

**SCHEDULE A**                          **LOAN POLICY**

| CASE NUMBER | DATE OF POLICY | AMOUNT OF INSURANCE | ENDORSEMENTS | POLICY NUMBER |
|---|---|---|---|---|
| 2003-1354 | JANUARY 6, 2004 @ 1:35 P.M. | $49,000.00 | 100, 300, 900 | G47-2237398 |
| | | | | |

1.    NAME OF INSURED:

      FIRST MAGNUS FINANCIAL CORPORATION, AN ARIZONA CORPORATION

2.    THE ESTATE OR INTEREST IN THE LAND WHICH IS ENCUMBERED BY THE INSURED MORTGAGE IS:

      FEE SIMPLE

3.    TITLE TO THE ESTATE OR INTEREST IN THE LAND IS VESTED IN:

      MARY ALICE HANNON

4.    THE INSURED MORTGAGE AND ASSIGNMENTS THEREOF, IF ANY, ARE DESCRIBED AS FOLLOWS:

      MORTGAGE FROM MARY ALICE HANNON TO FIRST MAGNUS FINANCIAL CORPORATION, AN ARIZONA CORPORATION, DATED DECEMBER 23, 2003, AND RECORDED JANUARY 6, 2004, IN THE RECORDER'S OFFICE OF LUZERNE COUNTY, PENNSYLVANIA IN RECORD BOOK 3004, PAGE 3200 IN THE AMOUNT OF $49,000.00.

5.    THE LAND REFERRED TO IN THIS POLICY IS DESCRIBED AS FOLLOWS:
      MAP NO.:  J9NE1N4L9
      SEE SCHEDULE A, PAGE 2, ATTACHED

ISSUED AT: MOOSIC, PA 18507
MICHAEL F. BAILEY

BY _____
MICHAEL F. BAILEY
AGENT

THIS POLICY IS INVALID UNLESS THE COVER SHEET AND SCHEDULE B ARE ATTACHED.
POLICY G47 LITHO IN U.S.A.
ALTA LOAN POLICY (10-17-92)                                         1196-09

### LAWYERS TITLE INSURANCE CORPORATION

# NATIONAL HEADQUARTERS - RICHMOND, VIRGINIA

## SCHEDULE A CONTINUED

SCHEDULE A, PAGE 2 - POLICY NO. G47-2237398

ALL the surface or right of soil of that certain lot, piece, parcel or tract of land, situate, lying and being in the Borough of Ashley, County of Luzerne, and Commonwealth of Pennsylvania, bounded and described as follows, to wit:

BEGINNING at the northwesterly corner of land quitclaimed to Anthony Koonrad, et ux., by Glen Alden Corporation by deed dated May 16, 1960 situated on the easterly side of Rutz Lane in the Borough of Ashley, Luzerne County, Pennsylvania;

THENCE along the easterly line of Rutz Lane, North forty six degrees thirty five minutes West (N. 46" 35' W.) fifty (50) feet to a corner, being the southwesterly corner of land quitclaimed to Michael Wackovsky, et ux., by Glen Alden Corporation by deed dated October 3, 1960;

THENCE along the southerly line of aforesaid land and lands of others, North forty three degrees twenty five minutes East (N 43° - 25' E.) one hundred twelve (112) feet to a corner, being the northwesterly corner of land quitclaimed to John J. Yanchak, et ux., by Glen Alden Corporation by deed dated October 22, 1962;

THENCE along the westerly line of aforesaid land, South forty six degrees thirty five minutes East (S. 46° - 35' E.) fifty (50) feet to a corner on the northerly line of land of above mentioned Anthony Koonrad, et ux., said corner also being the southwesterly corner of land of John J. Yanchak, et ux.;

THENCE along the northerly line of land now or late of Anthony Koonrad, et ux., South forty three degrees twenty five minutes West (S. 43° - 25' W.) one hundred twelve (112) feet to the place of beginning.

**LAWYERS TITLE INSURANCE CORPORATION**
**NATIONAL HEADQUARTERS - RICHMOND, VIRGINIA**

**SCHEDULE B**
**PART I**

| CASE NUMBER | POLICY NUMBER |
|---|---|
| 2003-1354 | G47-2237398 |

**EXCEPTIONS FROM COVERAGE**

THIS POLICY DOES NOT INSURE AGAINST LOSS OR DAMAGE (AND THE COMPANY WILL NOT PAY COSTS, ATTORNEYS' FEES OR EXPENSES) WHICH ARISE BY REASON OF:

1.  Defects, liens, encumbrances, adverse claims or other matters, if any, created, first appearing in the public records or attaching subsequent to the effective date hereof but prior to the date the proposed insured acquires for value of record the estate or interest or mortgage thereon covered by this Commitment.

2.  Covenants, conditions and restrictions, if any, appearing in the public records.

3.  Any easement, rights of way or servitudes appearing in public record. This policy insures that none of the improvements encroach upon the easements.

4.  Easements or servitudes which are unrecorded or are apparent from an inspection of the premises and any variation in location or dimensions, conflict with lines of adjoining property, encroachments, projections or other matters which might be disclosed by an accurate survey of the premises.

5.  Terms and conditions of any unrecorded lease or rights of parties in possession of any portion of the land.

6.  Any taxes or assessments for the current or fiscal year of the applicable taxing body which may be hereafter assessed, not yet due and payable.

7.  Any reservations, restrictions, limitations, conditions or agreements set forth in the instrument by which title is vested in the insured owner.

8.  All rights or claims of parties in possession of any portion of the land.

9.  All roads, public or private, in any manner affecting the premises.

10. Accuracy of acreage content and/or square footage not guaranteed.

11.   All coal and mining rights and all rights relating thereto.

THIS DOCUMANT DOES NOT INCLUDE OR INSURE THE TITLE TO THE COAL AND
THE RIGHT OF SUPPORT UNDERNEATH THE SURFACE LAND DESCRIBED OR
REFERRED TO HEREIN AND THE OWNER OR OWNERS OF SUCH COAL MAY HAVE
THE COMPLETE LEGAL RIGHT TO REMOVE ALL OF SUCH COAL AND, IN THAT
CONNECTION, DAMAGE MAY RESULT TO THE SURFACE OF THE LAND AND ANY
HOUSE, BUILDING OR OTHER STRUCTURE ON OR IN SUCH LAND.      THE
INCLUSION OF THIS NOTICE DOES NOT ENLARGE, RESTRICT OR MODIFY ANY
LEGAL RIGHTS OR ESTATES OTHERWISE CREATED, TRANSFERRED, EXCEPTED
OR RESERVED BY THIS INSTRUMENT.

## PART II

IN ADDITION TO THE MATTERS SET FORTH IN PART I OF THIS SCHEDULE, THE TITLE TO THE ESTATE OR
INTEREST IN THE LAND DESCRIBED OR REFERRED TO IN SCHEDULE A IS SUBJECT TO THE FOLLOWING
MATTERS, IF ANY BE SHOWN, BUT THE COMPANY INSURES THAT SUCH MATTERS ARE SUBORDINATE TO
THE LIEN OR CHARGE OF THE INSURED MORTGAGE UPON THE ESTATE OR INTEREST:

    NONE

POLICY G47 LITHO IN U.S.A.
ALTA LOAN POLICY (10-17-92)                                                   1191-70

ISSUED BY                                                                                    **PA ENDORSEMENT 100**

## Lawyers Title Insurance Corporation
*A LANDAMERICA COMPANY*

File No.: 2003-1354

Attached to and made a part of Policy No.: G47-2237398

The Company insures that the covenants, conditions and restrictions affecting the title to the land contained in
                                                have not been violated and that future violation thereof will
not cause a forfeiture or reversion of title.

As used in this endorsement, the words "covenants, conditions and restrictions" shall not be deemed to refer to or
include any terms, covenants, conditions or limitations contained in an instrument creating a lease.

As used in this endorsement, the words "covenants, conditions and restrictions" shall not be deemed to refer to or
include any covenants, conditions or restrictions relating to environmental protection.

This endorsement is made a part of the Policy and is subject to all of the terms and provisions thereof and of any
prior endorsements thereto. Except to the extent expressly stated, it neither modifies any of the terms and
provisions of the Policy and any prior endorsements, nor does it extend the effective date of the Policy and any
prior endorsements, nor does it increase the face amount thereof.

**IN WITNESS WHEREOF, LAWYERS TITLE INSURANCE CORPORATION** has caused this endorsement to be
issued and become valid when signed by an authorized officer or licensed agent of the Company.

**LAWYERS TITLE INSURANCE CORPORATION**

By:  *Janet A. Alpert*
                                                                              President

Attest:  *John D. Webb*
                                                                              Secretary

By: _____
    Authorized Officer or Licensed Agent

TIRBOP – PA Endorsement 100 (Restrictions – No Apparent Violations) (Rev. 03/01/00)
LOAN POLICY ONLY
**Form 1037-9**

**ORIGINAL**

**LAWYERS TITLE INSURANCE CORPORATION**
**NATIONAL HEADQUARTERS - RICHMOND, VIRGINIA**

**PA ENDORSEMENT 300**

Attached to and made a part of Policy Number G47-2237398

File Number 2003-1354

The Company eliminates from its loan policy the exception reading as follows:

Easements or servitudes which are unrecorded or are apparent from an inspection of the premises and any variation in location or dimensions, conflict with lines of adjoining property, encroachments, projections or other matters which might be disclosed by an accurate survey of the premises.

and further insures, except as set forth above, against loss by reason of encroachment, other than by party walls, whether by the building on the land encroaching upon adjacent property or by any building on adjacent property encroaching upon the said land.

This endorsement is made a part of the Policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the Policy and any prior endorsements, nor does it extend the effective date of the Policy and any prior endorsements, nor does it increase the face amount thereof.

**IN WITNESS WHEREOF,** Lawyers Title Insurance Corporation has caused this endorsement to be issued and become valid when signed by an authorized officer or licensed agent of the Company.

LAWYERS TITLE INSURANCE CORPORATION

By: Janet A. Alpert
President

Attest: J.A. D. Web
Secretary

By _____
AUTHORIZED OFFICER OR LICENSED AGENT

TIRBOP - PA ENDORSEMENT 300 (Mortgage Survey Exception) (03/01/1995)
LOAN POLICY ONLY
Form 1042-9

### LAWYERS TITLE INSURANCE CORPORATION
### NATIONAL HEADQUARTERS - RICHMOND, VIRGINIA

#### ENVIRONMENTAL PROTECTION LIEN
#### PA ENDORSEMENT 900
#### ALTA FORM 8.1

Attached to and made a part of Policy Number G47-2237398       File Number 2003-1354

     The insurance afforded by this endorsement is only effective if the land is used or is to be used primarily for residential purposes.

     The Company insures the insured against loss or damage sustained by reason of lack of priority of the lien of the insured mortgage over:

     (a) any environmental protection lien which, at Date of Policy, is recorded in those records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge, or filed in the records of the clerk of the United States District Court for the district in which the land is located, except as set forth in Schedule B; or

     (b) any environmental protection lien provided for by any state statute in effect at Date of Policy, except environmental protection liens provided for by the following state statutes:

     (1) **THE LAND AND WATER CONSERVATION AND RECLAMATION ACT (32 P.S. SEC. 5101 ET SEQ.)**

     This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

     IN WITNESS WHEREOF, Lawyers Title Insurance Corporation has caused this Endorsement to be issued and become valid when signed by an authorized officer or licensed agent of the Company.

**LAWYERS TITLE INSURANCE CORPORATION**

By: _Janet A. Alpert_
                    President

Attest: _J. L. D. Web_
                    Secretary

BY_____
AUTHORIZED OFFICER OR LICENSED AGENT

TIRBOP - PA ENDORSEMENT 900 (ALTA Endorsement 8.1) (Environmental Protection Lien Endorsement) (03/01/1995)
RESIDENTIAL LOAN POLICY ONLY
**Form 2291-52**

## CONDITIONS AND STIPULATIONS - CONTINUED

fees and expenses incurred by the Insured claimant which were authorized by the Company up to time of payment and which the Company is obligated to pay; or

(ii) to pay or otherwise settle with the insured claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in paragraphs b(i) or (ii), the Company's obligations to the insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute or continue any litigation.

**7. DETERMINATION AND EXTENT OF LIABILITY.**

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described.

(a) The liability of the Company under this policy shall not exceed the least of:

(i) the Amount of Insurance stated in Schedule A, or, if applicable, the amount of Insurance as defined in Section 2(c) of these Conditions and Stipulations;

(ii) the amount of the unpaid principal indebtedness secured by the insured mortgage as limited or provided under Section 8 of these Conditions and Stipulations or as reduced under Section 9 of these Conditions and Stipulations, at the time of loss or damage insured against by this policy occurs, together with interest thereon; or

(iii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy.

(b) In the event the insured has acquired the estate or interest in the manner described in Section 2(a) of these Conditions and Stipulations or has conveyed the title, then the liability of the Company shall continue as set forth in Section 7(a) of these Conditions and Stipulations.

(c) The Company will pay only those costs, attorneys' fees and expenses incurred in accordance with Section 4 of these Conditions and Stipulations.

**8. LIMITATION OF LIABILITY.**

(a) If the Company establishes the title, or removes the alleged defect, lien or encumbrance, or cures the lack of a right of access to or from the land, or cures the claim of unmarketability of title, or otherwise establishes the lien of the insured mortgage, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals therefrom, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused thereby.

(b) In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title or to the lien of the insured mortgage, as insured.

(c) The Company shall not be liable for loss or damage to any insured for liability voluntarily assumed by the insured in settling any claim or suit without the prior written consent of the Company.

(d) The Company shall not be liable for: (i) any indebtedness created subsequent to Date of Policy except for advances made to protect the lien of the insured mortgage and secured thereby and reasonable amounts expended to prevent deterioration of improvements; or (ii) construction loan advances made subsequent to Date of Policy, except construction loan advances made subsequent to Date of Policy for the purpose of financing in whole or in part the construction of an improvement to the land which at Date of Policy were secured by the insured mortgage and which the insured was and continued to be obligated to advance at and after Date of Policy.

**9. REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY.**

(a) All payments under this policy, except payments made for costs, attorneys' fees and expenses, shall reduce the amount of the insurance pro tanto. However, any payments made prior to the acquisition of title to the estate or interest as provided in Section 2(a) of these Conditions and Stipulations shall not reduce pro tanto the amount of the insurance afforded under this policy except to the extent that the payments reduce the amount of the indebtedness secured by the insured mortgage.

(b) Payment in part by any person of the principal of the indebtedness, or any other obligation secured by the insured mortgage, or any voluntary partial satisfaction or release of the insured mortgage, to the extent of the payment, satisfaction or release, shall reduce the amount of insurance pro tanto. The amount of insurance may thereafter be increased by accruing interest and advances made to protect the lien of the insured mortgage and secured thereby, with interest thereon, provided in no event shall the amount of insurance be greater than the Amount of Insurance stated in Schedule A.

(c) Payment in full by any person or the voluntary satisfaction or release of the insured mortgage shall terminate all liability of the Company except as provided in Section 2(a) of these Conditions and Stipulations.

**10. LIABILITY NONCUMULATIVE.**

If the insured acquires title to the estate or interest in satisfaction of the indebtedness secured by the insured mortgage, or any part thereof, it is expressly understood that the amount of insurance under this policy shall be reduced by any amount the Company may pay under any policy insuring a mortgage to which exception is taken in Schedule B or to which the insured has agreed, assumed, or taken subject, or which is hereafter executed by an insured and which is a charge or lien on the estate or interest described or referred to in Schedule A, and the amount so paid shall be deemed a payment under this policy.

**11. PAYMENT OF LOSS.**

(a) No payment shall be made without producing this policy for endorsement of the payment unless the policy has been lost or destroyed, in which case proof of loss or destruction shall be furnished to the satisfaction of the Company.

(b) When liability and the extent of loss or damage has been definitely fixed in accordance with these Conditions and Stipulations, the loss or damage shall be payable within 30 days thereafter.

**12. SUBROGATION UPON PAYMENT OR SETTLEMENT.**

(a) The Company's Right of Subrogation.

Whenever the Company shall have settled and paid a claim under this policy, all right of subrogation shall vest in the Company unaffected by any act of the insured claimant.

The Company shall be subrogated to and be entitled to all rights and remedies which the insured claimant would have had against any person or property in respect to the claim had this policy not been issued. If requested by the Company, the insured claimant shall transfer to the Company all rights and remedies against any person or property necessary in order to perfect this right of subrogation. The insured claimant shall permit the Company to sue, compromise or settle in the name of the insured claimant and to use the name of the insured claimant in any transaction or litigation involving these rights or remedies.

If a payment on account of a claim does not fully cover the loss of the insured claimant, the Company shall be subrogated to all rights and remedies of the insured claimant after the insured claimant shall have recovered its principal, interest, and costs of collection.

(b) The Insured's Rights and Limitations.

Notwithstanding the foregoing, the owner of the indebtedness secured by the insured mortgage, provided the priority of the lien of the insured mortgage or its enforceability is not affected, may release or substitute the personal liability of any debtor or guarantor, or extend or otherwise modify the terms of payment, or release a portion of the estate or interest from the lien of the insured mortgage, or release any collateral security for the indebtedness.

When the permitted acts of the insured claimant occur and the insured has knowledge of any claim of the title or interest adverse to the title to the estate or interest or the priority of enforceability of the lien of the insured mortgage, as insured, the Company shall be required to pay only that part of any losses insured against by this policy which shall exceed the amount, if any, lost to the Company by reason of the impairment by the insured claimant of the Company's right of subrogation.

(c) The Company's Rights Against Non-insured Obligors.

The Company's right of subrogation against non-insured obligors shall exist and shall include, without limitation, the rights of the insured to indemnities, guaranties, other policies of insurance or bonds, notwithstanding any terms or conditions contained in those instruments which provide for subrogation rights by reason of this policy.

The Company's right of subrogation shall not be avoided by acquisition of the insured mortgage by an obligor (except an obligor described in Section 1(a)(ii) of these Conditions and Stipulations) who acquires the insured mortgage as a result of an indemnity, guarantee, other policy of insurance, or bond and the obligor will not be an insured under this policy, notwithstanding Section 1(a)(i) of these Conditions and Stipulations.

**13. ARBITRATION.**

Unless prohibited by applicable law, either the Company or the insured may demand arbitration pursuant to the Title Insurance Arbitration Rules of the American Arbitration Association. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the insured arising out of or relating to this policy, any service of the Company in connection with its issuance or the breach of a policy provision or other obligation. All arbitrable matters when the Amount of Insurance is $1,000,000 or less shall be arbitrated at the option of either the Company or the insured. All arbitrable matters when the Amount of Insurance is in excess of $1,000,000 shall be arbitrated only when agreed to by both the Company and the insured. Arbitration pursuant to this policy and under the Rules in effect on the date the demand for arbitration is made or, at the option of the insured, the Rules in effect at Date of Policy shall be binding upon the parties. The award may include attorneys' fees only if the laws of the state in which the land is located permit a court to award attorneys' fees to a prevailing party. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

The law of the situs of the land shall apply to an arbitration under the Title Insurance Arbitration Rules.

A copy of the Rules may be obtained from the Company upon request.

**14. LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT.**

(a) This policy together with all endorsements, if any, attached hereto by the Company is the entire policy and contract between the insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b) Any claim of loss or damage, whether or not based on negligence, and which arises out of the status of the lien of the insured mortgage or of the title to the estate or interest covered hereby or by any action asserting such claim, shall be restricted to this policy.

(c) No amendment of or endorsement to this policy can be made except by a writing endorsed hereon or attached hereto signed by either the President, a Vice President, the Secretary, an Assistant Secretary, or validating officer or authorized signatory of the Company.

**15. SEVERABILITY.**

In the event any provision of this policy is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision and all other provisions shall remain in full force and effect.

**16. NOTICES WHERE SENT.**

All notices required to be given the Company and any statement in writing required to be furnished the Company shall include the number of this policy and shall be addressed to: Consumer Affairs Department, P.O. Box 27567, Richmond, Virginia 23261-7567.

| United States Bankruptcy Court Middle District of Pennsylvania | | Amended Proof of Claim |
| --- | --- | --- |
| In re (Name of Debtor)<br>Mary Alice Margaret Hannon | Case Number<br>06-51870-JJT Chapter 13 | |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| | |
| --- | --- |
| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>COUNTRYWIDE HOME LOANS. INC. ITS SUCCESSORS AND/OR ASSIGNS | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. |
| Name and Address Where Notices Should be Sent<br>Countrywide Home Loans, Inc.<br>Bankruptcy Department<br>7105 Corporate Drive<br>Mail Stop PTX-C-35<br>Plano, TX 75024<br>(972) 608 6000 | ☐ Check box if you have never received any notices from the bankruptcy court in this case.<br><br>☐ Check box if the address differs from the address on the envelope sent to you by the court. |
| | THIS SPACE IS FOR COURT USE ONLY |

| ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR:<br>XXXXX5778 | Check here if this claim ☐ replaces a previously filed claim, dated: November 6, 2006<br>☒ amends |
| --- | --- |

**1. BASIS FOR CLAIM**
- ☐ Goods Sold
- ☐ Services performed
- ☒ Money loaned (Real Estate Mortgage)
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☐ Other (Describe briefly)

- ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
- ☐ Wages, salaries, and compensation (Fill out below)
  Last four digits of SS#_____
  Unpaid compensation for services performed
  from _____ to _____
       (date)              (date)

| 2. DATE DEBT WAS INCURRED<br>December 23, 2003 | 3. IF COURT JUDGMENT, DATE OBTAINED: |
| --- | --- |

**4. Total Amount of Claim at Time Case Filed:** $ _____
(Unsecured)    $ 54,399.59 * (Secured)    _____ (Priority)    $ 54,399.59 * Total

If all or part of your claim is secured or entitled to priority, also complete item 5 or 7 below.
☒ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☒ Check this box if your claim is secured by collateral (including right to setoff).

Brief Description of Collateral:
☒ Real Estate ☐ Motor Vehicle ☐ Other (Describe Briefly)
Value of Collateral: _____

Amount of arrearage and other charges at time case filed included in secured claim, if any $ 6,794.53

**6. UNSECURED NONPRIORITY CLAIM $** _____
☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.
* this is an estimated figure and is not to be relied upon as a payoff statement

**7. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim.
Amount entitled to priority $_____
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $4,650),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier--11 U.S.C. § 507(a)(3)
☐ Contributions to an employee benefit plan--11 U.S.C. § 507(a)(4)
☐ Up to $2,100* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use--11 U.S.C. § 507(a)(6)
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child--11 U.S.C. § 507(a)(6)
☐ Taxes or penalties of government units--11 U.S.C. § 507(a)(8)
☐ Other--Specify applicable paragraph of -11 U.S.C. § 507(a)_____
*Amounts are subject to adjustment on 4/1/04 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**8. CREDITS:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. In filing this claim, claimant has deducted all amounts that claimant owes to debtor.

**9. SUPPORTING DOCUMENTS:** _Attach copies of supporting documents_, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**10. DATE-STAMPED COPY:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

| Date<br>December 29, 2006 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any)<br>/s/<br><br>Alice A. Blanco/Karrolianne K. Cayce/John D. Schlotter/Michael J. McCormick/A. Michelle Hart/Matthew Dyer Agent for Countrywide Home Loans, Inc. It's Successors and/or assigns |
| --- | --- |

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
## WILKES-BARRE DIVISION

IN RE:                                          )
                                                )   CASE NO. 06-51870-JJT
Mary Alice Margaret  Hannon                     )   CHAPTER 13
                                                )   JUDGE John J. Thomas
                                                )

## EXHIBIT A

## ITEMIZATION OF CLAIM

Total Arrearage as of 10/24/2006
* Regular Monthly Installments of $ 309.71
  March 2006 through October 2006                                  $ 2,477.68
* Pre Petition Escrow Shortage                                         510.85
* Foreclosure Fee                                                      750.00
* Title Bringdown                                                       75.00
* Title Report                                                         250.00
* Service                                                               81.00
* Prothonotary                                                         106.00
* Sheriff Deposit                                                    2,500.00
* Prothonotary                                                          44.00

                                TOTAL ARREARAGES            $ 6,794.53


The Interest Rate is: 6.5%

Please forward all payments to Countrywide Home Loan, Inc., Bankruptcy Department, Payment Processing PTX-B-209, 7105
Corporate Drive, Plano, TX 75024-1319

Please forward all correspondence and court pleadings to McCALLA RAYMER, LLC, National Bankruptcy Department, 1544
Old Alabama Road, Roswell, Georgia 30076-2102, 770-643-7200. File No. CHL-06-10893. Property Address: 14 Rutz Street,
Ashley, PA 18706.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
WILKES-BARRE DIVISION

IN RE:                     )

                             )    CASE NO. 06-51870-JJT
Mary Alice Margaret Hannon     )    CHAPTER 13
                             )    JUDGE John J. Thomas
                             )

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Proof of Claim, has been served by

First Class Mail, postage pre-paid, upon the following parties in interest on the _____29_____ day of

December, 2006

Debtor's Attorney:

Carlo Sabatini, Esq.
142 North Washington Avenue
Suite 800
Scranton, PA 18503

Chapter 13 Trustee:

Charles J. DeHart, III
8125 Adams Drive
Suite A
Hummelstown, PA 17036

/s/ _____

Alice A. Blanco, Georgia Bar No. 062160
Carrollanne K. Cayce, Georgia Bar No. 428978
John D. Schlotter, Georgia Bar No. 629456
Michael J. McCormick, Georgia Bar No. 485749
A. Michelle Hart, Georgia Bar No. 334291
Matthew Dyer, Georgia Bar No. 236848

File No. CHL-06-10893

THIS LAW FIRM IS ACTING AS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT.
ANY INFORMATION OBTAINED MAY BE USED FOR THAT PURPOSE.